# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** **ex rel. DEBRA LEGGINS and ROBERT CLERICI,** | '514-CV-316-OU -18TRS |
| **Plaintiffs,** | **CASE NO.:** _____ |
| **v.** | **FILED UNDER SEAL** |
| **ORLANDO HOUSING AUTHORITY, ORLANDO HOUSING AUTHORITY PROPERTIES, INC., FINLAY DEVELOPMENT, LLC, VIVIAN BRYANT, and ELLIS HENRY,** | 2014 FEB 25 PM 3:07 |
| **Defendants.** | |

## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

Co-Relators Debra Leggins and Robert Clerici (collectively "Relators") by and through their counsel, hereby file this Complaint and Demand for Jury Trial against Defendants and allege as follows:

## NATURE OF ACTION

1.  Relators bring this action on behalf of the United States of America against Defendants for their violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

2.  Relators also bring this action to address OHA's retaliation against Relators in violation of the whistleblower provision of the False Claims Act, 31 U.S.C. § 3730(h).

## JURISDICTION AND VENUE

2.      This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq*. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1331.

3.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(2) because the acts proscribed by 31 U.S.C. § 3729, *et seq*. and complained of herein took place in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because at all times material hereto, Defendants Orlando Housing Authority, Orlando Housing Authority Properties, Inc., and Finlay Development, LLC transact and transacted business in this District.

## PARTIES

4.      Relator Debra Leggins is a citizen of the United States and a resident of the State of Florida. From December 1999 until July 11, 2011, Relator Leggins was employed by Defendant Orlando Housing Authority ("OHA"). Relator Leggins was the Budget Accountant for Public Housing from December 1999 until February 2000 and was the Finance Director from February 2000 until July 11, 2011. Relator Leggins also performed CFO duties from April 2009 until her termination.

5.      Relator Robert Clerici is a citizen of the United States and a resident of the State of Florida. From July 7, 2008 until December 11, 2011, Relator Clerici was employed by OHA as its Purchasing Manager. As Purchasing Manager, Relator Clerici was intimately involved in OHA's procurement activities. Prior to his employment at OHA, Relator Clerici was employed by Defendant Finlay Development, LLC ("Finlay Development"), a development contractor that worked directly with OHA.

6.      Relators are original sources of this information to the United States. Relators have direct and independent knowledge of the information on which the allegations are based and have voluntarily provided the information to the United States Government before filing this action under the False Claims Act.

7.      Defendant Orlando Housing Authority is an independent public corporation, doing business in Orange County, Florida. OHA is responsible for administering and operating the local public housing program under the guidance of the United States Department of Housing and Urban Development ("HUD"). OHA is funded by HUD.

8.      Defendant Orlando Housing Authority Properties, Inc. ("Properties, Inc.") is a non-profit corporation that is wholly-owned by OHA.

9.      Defendant Vivian Bryant is the president and CEO of OHA.

10.     Defendant Ellis Henry is the former COO of OHA.

11.     Defendant Finlay Development, LLC is a Florida limited liability corporation and national developer of tax credit properties.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

12.     As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), Relators have provided to the Attorney General of the United States and to the United States Attorney for the Middle District of Florida a statement of all material evidence and information related to the Complaint. The disclosure statement is supported by material evidence known to Relators at the time of their filing, establishing the existence of Defendants' false claims. The disclosure statement includes attorney-client communications and work product of Relators' attorneys and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in this litigation; therefore, the disclosure is confidential.

## GENERAL ALLEGATIONS

13.     Defendants have engaged in several schemes to defraud the federal government of significant funds.

14.     Properties, Inc. has been used by OHA to launder federal money, including Section 8 funds and profits from an eminent domain settlement.

### *Fraudulent Use of Section 8 Funds*

15.     The Section 8 program entails using HUD funds to pay "rental subsidies so eligible families can afford decent, safe and sanitary housing." 24 C.F.R. § 982.1(a)(1). Section 8 HUD funds also pay for Public Housing Authorities' ("PHA") administrative costs of operating a Section 8 program. 24 C.F.R. § 982.152.

16.     Each fiscal year, a PHA submits its proposed Section 8 budget for HUD approval. 24 C.F.R. § 982.157(a). Once HUD approves the budget, HUD and the PHA enter into an Annual Contributions Contract ("ACC") whereby "HUD agrees to make payments to the PHA, over a specified term, for housing assistance payments . . . and for the PHA administrative fee." In turn, "[t]he PHA agrees to administer the program in accordance with HUD regulations and requirements." 24 C.F.R. § 982.151(a)(1).

17.     Each ACC covers a specified funding increment. "[C]ommitments for all the funding increments in a PHA program are listed in one consolidated contractual document called the consolidated annual contributions contract (consolidated ACC)." 24 C.F.R. § 982.151(a)(2).

18.     "HUD payments to the PHA under the consolidated ACC, and any other amounts received by the PHA in connection with the [Section 8] program" are called "program receipts." 24 C.F.R. § 982.4(b). Interest earned on the investment of program receipts is considered program receipts. HUD Consolidated ACC, HUD Form HUD-52520, ¶ 11(c).

19.     All "[p]rogram receipts must be used in accordance with the PHA's HUD-approved budget . . . [and] may only be used for . . . housing assistance payments[] and PHA administrative fees." 24 C.F.R. § 982.157(b).

20.     When OHA had surplus Section 8 funds, it siphoned the money into Properties, Inc. rather than using it for Section 8 purposes or remitting it to HUD.

21.     OHA also intentionally misrepresented that it was providing more subsidies than it was, and it would deposit the extra funds into Properties, Inc. The money was then used to fund impermissible events, including but not limited to the events set forth in this Complaint.

22.     In August 2009, OHA used at least $31,283.92 of Section 8 funds to pay for a Carver Park grand opening event, a volunteer luncheon, and a ceremonial art exhibit. None of these events were associated with OHA's Section 8 program.

23.     This expenditure of funds is reflected in ACH payments to Akens Design, Inc., an event planner, on July 30, 2009 ($3,100.00), August 10, 2009 ($10,850.00), August 26, 2009 ($10,901.00), and September 16, 2009 ($6,432.92).

24.     In 2010 and 2011, OHA spent at least $50,962.76 of Section 8 funds on a volunteer appreciation luncheon and dedication ceremony for the Moving to Work Center (also known as the Matilde Roman Center). None of these events were associated with OHA's Section 8 program.

25.     This expenditure of funds is reflected in payments to Akens Design, Inc. on August 1, 2010 ($2,460.00), August 26, 2010 ($4,540.00), September 16, 2010 ($2,640.00), September 23, 2010 ($2,687.68), October 2, 2010 ($6,790.02), October 20, 2010 ($5,337.74), November 19, 2010 ($2,600.00), November 30, 2010 ($13,991.27), December 15, 2010 ($7,684.61), and February 24, 2011 ($2,231.44).

*Fraudulent Laundering of Eminent Domain Settlement Funds*

26.     OHA also fraudulently laundered funds from an eminent domain settlement through Properties, Inc.

27.     In 2007, The Florida Department of Transportation took 1.03 acres of the Griffin Park housing project through eminent domain. The taking included one non-dwelling and two dwelling units. The total settlement amount was $4,333,517.00.

28.     Eminent domain settlements of public housing property must be approved by HUD.

29.     The eminent domain settlement for Griffin Park was approved by HUD, but it was conditioned on OHA's agreement that it would use the settlement funds for specified public housing projects.

30.     OHA represented to HUD that it would use the funds for the replacement of the lost Griffin Park units and that the rest of the funds would be used for the completion of the revitalization of another OHA property, Carver Park. These promises were memorialized in a document that Relator Leggins saw.

31.     Approximately $930,730.00 of the eminent domain funds were funneled into Properties, Inc.

32.     $50,000.00 of the eminent domain funds were used for OHA's Seventieth Anniversary Gala in violation of OHA's agreement with HUD.

33.     This expenditure of funds is reflected, in part, by payments to Akens Design, Inc. on June 17, 2008 ($2,475.00) and June 26, 2008 ($2,475.00).

34.     The improper use of the Section 8 and the eminent domain funds also violated the regulations for cost principles applicable to non-profit organizations, 2 C.F.R. Part 230.

*Improper Procurement*

35.      OHA is subject to the HUD procurement regulations set forth in 24 C.F.R. § 85.36. These regulations are in place to ensure the efficient use of tax-payer dollars in carrying out HUD's mission of "creat[ing] strong, sustainable, inclusive communities and quality affordable homes for all." Central to the efficient use of funds is the requirement that "[a]ll procurement transactions will be conducted in a manner providing full and open competition." 24 C.F.R. § 85.36(c).

36.      OHA further defrauded the government by failing to follow proper procurement procedures, resulting in a waste of government funds. These procurement violations include, but are not limited to, the examples contained in this Complaint.

37.      The Hope VI Grant program is a federally-funded program administered by HUD for the purpose of revitalizing severely depressed public housing.

38.      In 2002, OHA was awarded an $18 million Hope VI Grant to be used for the revitalization of the former Carver Court public housing development, now named Carver Park.

39.      The Carver Park revitalization is an ongoing project.

40.      OHA hired an outside developer, Finlay Development, to oversee the Carver Park project.

41.      Because OHA is a managing partner in the Owner Entity of Carver Park, it was OHA's responsibility to ensure that Finlay Development followed proper procurement procedures.

42.      Finlay Development did not follow proper procurement procedures.

43.      Relator Clerici was employed by Finlay Development from 2006 through 2008 and has personal knowledge of its failure to adhere to HUD procurement regulations.

44.     Finlay Development hired or contracted with certain companies without conducting a proper Request for Quotations ("RFQ") or formal procurement.

45.     For example, Finlay Development hired Bradley Development, LLC as the construction contractor without conducting a RFQ or formal procurement pursuant to HUD regulations.

46.     Additionally, Finlay paid nearly $2.2 million for installation of underground utilities without properly bidding out the contracts.

47.     From 2006 through 2008, Finlay never performed a proper RFQ or formal procurement in relation to Carver Park.

48.     Christopher Finlay, the owner of Finlay Development, instructed who should be contracted with or hired without going through proper procurement procedures.

49.     When Relator Clerici left Finlay Development in 2008 and joined OHA, he continued to observe that OHA was not requiring Finlay Development to abide by HUD procurement regulations.

*Bid Splitting*

50.     In 2010, OHA contracted with Stratigi Staffing, LLC ("Stratigi") to provide temporary staffing services without obtaining any other quotes.

51.     More than a year later, OHA attempted to cover up its fraud by obtaining quotes from other vendors in order to paper the file.

52.     HUD Procurement Handbook 5.3.C. requires that "The Contracting Officer shall not break down requirements aggregating more than the small purchase threshold . . . into multiple purchases that are less than the applicable threshold . . . merely to permit use of the

small purchase procedures or avoid any requirements that apply to purchases that exceed those thresholds." This process is called "bid splitting."

53.     OHA fraudulently avoided conducting a formal procurement process for Stratigi by bid splitting, falsely making it appear that there were separate purchases for an amount slightly under the $100,000 small purchase threshold, in violation of HUD regulations.

54.     From May 19, 2010 through September 29, 2011, OHA paid Stratigi at least $240,852.13 without properly procuring the contract, beginning with a payment of $4,174.50 on May 19, 2010 and concluding with a payment of $2,452.40 on September 29, 2011.

55.     On June 21, 2011, Sandra Stephens, an Accounts Payable Technician at OHA, objected to paying Stratigi because Stratigi was "not an authorized State of Florida contracted vendor."

56.     Once this issue was called to his attention, Relator Clerici addressed the problem to Defendant Henry and CFO Barbara Chen. Instantly, Relator Clerici was admonished for causing problems.

57.     To cover their tracks, Defendant Henry instructed Relator Clerici to obtain the appropriate number of quotes in order to paper the file.

58.     Even after OHA belatedly obtained quotes, it did not award the temporary staffing contract to the lowest bidder.

59.     OHA received five quotes in response to the RFQ. As the following chart of quotations demonstrates (submitted hourly wages for each position), RemX had the lowest quote and therefore, the contract should have been awarded to RemX.

| Position | Spherion | VACO | RemX | Manpower | Stratigi |
|---|---|---|---|---|---|
| Management Asst/Clerk Cashier | 21.63 (4) | 23.80 (5) | 15.96 (2) | 13.50 (1) | 16.34 (3) |

| Position | Spherion | VACO | RemX | Manpower | Stratigi |
|---|---|---|---|---|---|
| Public Housing Manager | 36.50 (4) | 41.10 (5) | 22.00 (1) | 24.30 (3) | 24.17 (2) |
| Eligibility Specialist | 18.00 (3) | 25.50 (5) | 15.96 (1) | 16.20 (2) | 19.04 (4) |
| Buyer | 28.85 (3) | 31.45 (5) | 26.60 (2) | 29.70 (4) | 22.86 (1) |

60.     24 C.F.R. § 85.36(d)(2)(ii)(D) requires that the award "be made in writing to the lowest responsive and responsible bidder," but OHA awarded the contract to Stratigi.

61.     Defendant Henry contacted Stratigi and persuaded Stratigi to adjust its quote so that it appeared to be the lowest bid. He did this by allowing Stratigi to raise its price for a Buyer to offset lowering other prices.

62.     Throughout this process, OHA continued to pay Stratigi, including, for example, payments of $2,554.56 on July 26, 2011; $ 6,386.40 on August 3, 2011; $2,428.40 on August 18, 2011.

63.     In addition, by engaging in bid splitting and reducing large contracts to less than the $100,000 threshold, OHA violated HUD's procurement regulations by failing to obtain bids via a sealed bid process, which is required for purchases of more than $100,000. 24 C.F.R. § 85.36(d)(2).

64.     OHA understood that the sealed bid process was required, but intentionally split the purchase in order to make it appear less than $100,000 and, thus, avoid the sealed bid process, issuing purchase orders in amounts of $99,000 (P.O. #13546, issued on December 18, 2010 by Defendant Henry as the signer purchasing official); $99,999 (P.O. #14045, issued on July 5, 2011 by Defendant Bryant as the signer purchasing official); and $99,024 (P.O. #12986, issued on May 10, 2010 by Defendant Henry as the signer purchasing official).

*Piggy-Backing*

65.     Pursuant to 24 C.F.R. § 85.36 and the HUD Procurement Handbook Chapter 14, OHA may utilize, or "piggy-back" on, a contract that has been procured by a state or local governmental agency through a competitive process that complies with § 85.36.

66.     The purpose of the piggy-backing provision is to leverage a properly procured contract that is already in place. If the terms of that contract are changed, it defeats the purpose because the contract was then not procured in accordance with § 85.36 as required.

67.     OHA has also abused the "piggy-backing" provision in other cases by claiming to piggy-back on a state or municipal contract but then changing the terms of the contract without following proper procurement procedures.

68.     OHA habitually uses the piggy-back provision improperly by contracting with temporary staffing companies that have state contracts but not adhering to those contracts.

69.     OHA never did an internal cost assessment of those contracts, as required by 24 C.F.R. § 85.36(f). *See also* HUD Handbook 14.2 (requiring that any state or local contract utilized by a PHA "provide[] for greater economy and efficiency and result[] in cost savings to the PHA.").

70.     Furthermore, OHA does not follow the terms of those contracts. Instead, OHA sets its own levels of pay for the employees, generally higher than set forth in the contract.

71.     Often, OHA shows favoritism to particular temporary employees by paying those employees well over the state procured contract.

*Emphasys Computer Software*

72.     On July 28, 2011, OHA entered a contract for computer software with Emphasys Computer Solutions, Inc. ("Emphasys") without following the proper procurement procedures.

73.     Although OHA initially obtained bids from multiple companies, those bids were more than two and a half years old, and so OHA was required to obtain new bids. OHA failed to do so.

74.     This failure to engage in proper procurement violated, inter alia, 24 C.F.R. § 85.36(b), which incorporates a grantee's procurement procedures, and § 85.36(c) by restricting competition.

75.     Leading up to this software purchase, OHA assembled a committee to research and decide which software to purchase. The committee solicited bids, narrowed the list of vendors, and had a select group of vendors give presentations to the committee. The committee then completed scoring and evaluation of each vendor.

76.     Defendant Bryant was dissatisfied with the results, and so she ordered OHA to spend additional funds to travel across the country to visit other housing authorities and examine those housing authorities' computer software programs. This process went on well over two and a half years from the time the initial bids were acquired.

77.     Upon information and belief, the money used to fund this extensive travel came at least in part from Properties, Inc.

78.     Ultimately, one of the companies that had submitted an original bid, Emphasys, was chosen.

*Additional Examples of Procurement Fraud*

79.     Hampton Park is a mixed-income, mixed-use community developed through a $6.8 million federal Hope VI Revitalization Grant.

80.     In September 2010, OHA, at the instruction of Defendant Henry, used funds from the Hope VI grant to purchase and install entertainment system equipment for the Hampton Park

club house, including stereo equipment, speakers, a mixing board, and a Blu-Ray DVD player, without obtaining the proper quotes, totaling at least $10,415.42 in spending on improperly procured equipment.

81.     On February 12, 2010, OHA, by order of Defendant Bryant, issued a purchase order to MD Strum Housing Services, Inc. ("MD Strum") for $20,088.00 for an audit of the Section 8 program without obtaining quotes from any other companies.

82.     On November 9, 2010, OHA "amended" its February purchase order to add an additional $11,925.00 for an audit of the Sanford Housing Authority's Section 8 Housing Choice Voucher files, again without obtaining any other quotes.

83.     The payments to MD Strum were made with Section 8 funds provided by HUD.

84.     In spring 2009, OHA hired Tradesmen International to perform a health and safety inspection of all of OHA's public housing locations without obtaining other quotes.

85.     OHA paid Tradesmen International approximately $97,297.00 in 2009, including, for example, for a $7,220.76 invoice dated March 27, 2009.

86.     Tradesmen International was paid out of OHA's public housing operating expense account and its capital fund, both of which are funded by HUD.

87.     Many times from 2008 through 2011, OHA hired Akens Design, the owner of which was Defendant Bryant's personal friend, to produce events for OHA without conducting any procurement. These events included the Carver Park grand opening, volunteer luncheon, ceremonial art exhibit, volunteer appreciation luncheon, dedication ceremony for the Moving to Work Center, and Seventieth Anniversary Gala set forth above.

88.     OHA hired Hawkins Delafield & Wood LLP ("HD&W") to assist with its Moving to Work application and implementation.

13

89.     In 2009, HD&W's initial bid for assisting with the Moving to Work application was $35,000.00.

90.     On December 17, 2009, OHA issued a purchase order to HD&W for $65,000.00, signed by Defendant Henry as the Purchasing Official.

91.     On December 17, 2009, HD&W invoiced OHA for $65,000.00, which was approved for payment by OHA – including Defendant Henry and Senior Accountant Aminata Harrison – on December 21, 2009.

92.     Thereafter, when OHA needed help implementing the Moving to Work program, it hired HD&W without obtaining the proper quotes.

93.     For example, from December 2010 through September 2011, OHA paid HD&W an additional $67,353.34.

94.     In or about September 2011, OHA paid HD&W an additional $75,000.00 in payment of a purchase order. Relator Clerici objected to the payment and explained to Defendant Henry that HD&W had not been properly procured. Defendant Henry became extremely upset and stormed out of Relator Clerici's office. Later, Defendant Henry told Relator Clerici that he arranged for the $75,000.00 to be paid via OHA's attorney at Saxon, Gilmore, Carraway & Gibbons, P.A. in order to avoid complying with HUD regulations.

95.     On or about September 9, 2011, per instruction by Defendant Henry, OHA paid HD&W $8,500.00 without any purchase order or back-up documentation.

96.     HD&W was paid out of OHA's public housing operating expense account, its capital fund, and its Section 8 funds, all of which are funded by HUD.

97.     OHA failed to follow required procurement procedures when hiring Rosa Kendrick Lawn Service to perform lawn maintenance on its properties.

98.     A Section 3 contractor must be "51 percent or more owned by Section 3 residents," or its "permanent, full-time employees must include persons, at least 30 percent of whom are currently Section 3 residents, or within three years of the date of first employment with the business concern were Section 3 residents."

99.     Although the owner of Rosa Kendrick Lawn Service, Rosa Kendrick, originally qualified because she was a Section 3 resident, she later moved out of public housing and was therefore no longer qualified.

100.    OHA improperly gave Rosa Kendrick Lawn Service preference as a "Section 3 contractor" after it no longer qualified as such.

101.    As of October 11, 2011, OHA had paid Rosa Kendrick Lawn Service approximately $439,829.37, including payments of $7,200.00 (P.O. #12675); $2,305.00 (P.O. #14118); and $2,430.00 (P.O. #14245), as just a few of many examples.

102.    Rosa Kendrick Lawn Service was paid out of OHA's public housing operating expense account, its capital fund, and its Section 8 funds, all of which are funded by HUD.

103.    In September 2009, OHA properly obtained quotes from companies to conduct employee training on reasonable accommodation requirements and sexual harassment, but it then failed to award the contract to the lowest bidder.

104.    The quote from the Housing and Development Law Institute ("HDLI") was for $12,495.00. The quote from Nan McKay and Associates, Inc. was for $8,547.00. Yet, OHA awarded the contract to HDLI, through issuance of purchase order #12567.

105.    OHA made payment to HDLI on October 21, 2009 for $12,495.

106.    HDLI was paid out of OHA's public housing operating expense account, its capital fund, and its Section 8 funds, all of which are funded by HUD.

107.    OHA also fraudulently used funds from the American Recovery and Reinvestment Act of 2009 ("ARRA").

108.    ARRA funds are prohibited from being used for management of mixed finance projects.

109.    OHA gave a portion of its $3.58 million in ARRA funds to Finlay Development and then Finlay Development used that money to pay Lane Management LLC to manage Carver Park, a mixed finance project, in violation of ARRA regulations.

**COUNT I**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

110.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 109 by reference.

111.    Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, presented, or caused to be presented, false or fraudulent claims for payment or approval.

112.    The U.S. Government was unaware of the falsity of Defendants' claims for payment or approval.

113.    As a result of Defendants' fraudulent actions, the United States has suffered damages.

114.    Relators have retained counsel to represent them in this matter and have incurred, and will continue to incur, attorneys' fees and costs.

**DEMAND FOR RELIEF**

WHEREFORE, Relators demand judgment against Defendants for:

(a)    Actual damages;

(b)    Treble damages;

(c)    Civil penalties of $11,000.00 per false claim that Defendants presented, or caused to be presented, to the federal Government;

(d)    Pre- and post-judgment interest;

(e)    Attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pursuing this case;

(f)    Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)    That Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(h)    Any other such relief as this Court deems just and proper

## COUNT II
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

115.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 109 by reference.

116.    Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment submitted to the federal Government.

117.    The U.S. Government was unaware of the falsity of Defendants' records and statements and, in reliance on the accuracy thereof, paid Defendants.

118.    As a result of Defendants' fraudulent actions, the United States has suffered damages.

119.    Relators have retained counsel to represent them in this matter and have incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Relators demand judgment against Defendants for:

(a)   Actual damages;

(b)   Treble damages;

(c)   Civil penalties of $11,000.00 per false record or statement material to a false or fraudulent claim made by, or caused to be made by, Defendants;

(d)   Pre- and post-judgment interest;

(e)   Attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pursuing this case;

(f)   Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)   That Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(h)   Any other such relief as this Court deems just and proper.

## COUNT III
## RETALIATION AGAINST LEGGINS
## IN VIOLATION OF 31 U.S.C. § 3730(h)

120.   Relator Leggins hereby incorporates the allegations set forth in paragraphs 1 through 109 by reference.

121.   During the course of her employment, Relator Leggins learned that OHA was defrauding the federal Government in several ways.

122.   Relator Leggins complained to Defendants Henry and Bryant about this fraud, and Relator Leggins refused to participate in the unlawful actions in an effort to stop the violations.

123.   Relator Leggins's efforts to stop OHA's fraud include, but are not limited to, the examples as outlined below in this Count.

124.    In September 2010, Relator Leggins refused to approve or pay the purchase order for the entertainment system equipment for the Hampton Park club house, set forth in paragraphs 79 and 80, because the proper procurement was not done.

125.    Defendant Henry demanded that Relator Leggins approve and pay the purchase order because Defendant Bryant wanted it paid. Relator Leggins again refused and stated that she would explain the problem to Defendant Bryant. In response, Defendant Henry told Relator Leggins "not to be insubordinate" by speaking to Defendant Bryant about this issue.

126.    Nevertheless, Relator Leggins spoke to Defendant Bryant the next day, objecting to the improper procurement practices associated with the entertainment system equipment and explaining why she refused to approve or pay the purchase order. Relator Leggins did this in an effort to stop the violation.

127.    Approximately two days later, and in retaliation for her objections and refusal to participate in the procurement violations, Relator Leggins was transferred to the Sanford Housing Authority and her computer access was restricted.

128.    Relator Leggins additionally complained about OHA improperly funneling funds from the Section 8 program and the eminent domain settlement into Properties, Inc. and then using those funds for extravagant events, as set forth in paragraphs 14 through 34.

129.    Additionally, each time Akens Design was hired for an event, as set forth in paragraphs 22 through 25, 32 through 33, and 87, Relator Leggins complained to Defendant Bryant about the procurement violations and the fact that it was unlawful to use federal money for entertainment purposes.

130.    For example, in fall 2010, Relator Leggins expressed her concerns to Defendant Bryant that it was unlawful for OHA to spend federal money on the volunteer appreciation luncheon and a dedication ceremony for the Moving to Work Center.

131.    In retaliation for her objections and refusal to participate in OHA's fraud, in December 2010, Relator Leggins was denied a promotion to the permanent CFO position.

132.    In or around June or July 2011, when OHA determined that it would contract with Emphasys, set forth in paragraphs 72 through 78, Relator Leggins objected, explaining that the previous bids were outdated and that lawfully OHA was required to re-bid the project. Relator Leggins attempted to stop this violation, but her employment was terminated before she could take further action.

133.    Relator Leggins also objected to the use of Stratigi due to the violations of the procurement regulations set forth in paragraphs 50 through 64. Relator Leggins continued to object to paying Stratigi each time a bill came due.

134.    At the end of June 2011, when Relator Leggins discovered the efforts to cover up the procurement fraud relating to Stratigi, she complained to Defendant Henry in an effort to stop the violations. Relator Leggins specifically told Defendant Henry "We [meaning OHA] cannot do this" and explained that what OHA was doing was violated HUD's procurement regulations.

135.    Less than a month later, in retaliation for her objections and refusal to participate in the procurement violations, OHA terminated Relator Leggins's employment.

136.    As a result of her lawful actions done in an effort to stop OHA's violations of federal regulations, Relator Leggins was harassed and retaliated against by OHA.

137.    Specifically, in retaliation for her efforts to stop OHA's violations, Relator Leggins was denied a promotion to the full-time CFO position; Relator Leggins was transferred

to the Sanford Housing Authority but was still required to perform her OHA job functions and to train the new CFO, Barbara Chen; Relator Leggins's computer access was restricted; and Relator Leggins's employment was terminated on July 11, 2011.

138.    As a direct and proximate result of this unlawful and discriminatory harassment and termination, Relator Leggins has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with her efforts to obtain alternative employment in an amount to be proven at trial.

### DEMAND FOR RELIEF

WHEREFORE, Relator Leggins demands judgment against Defendants for:

(a)    Two times her back pay;

(b)    Compensatory damages;

(c)    Pre- and Post-judgment interest;

(d)    Reinstatement in her previous position at OHA;

(e)    Attorneys' fees and costs of this action; and

(f)    Such other relief as this Court deems just and proper.

### COUNT IV
### RETALIATION AGAINST CLERICI
### IN VIOLATION OF 31 U.S.C. § 3730(h)

139.    Relator Clerici hereby incorporates the allegations set forth in paragraphs 1 through 109 by reference.

140.    During the course of his employment, Relator Clerici learned that OHA was defrauding the federal Government in several ways.

141.    Relator Clerici complained to his direct supervisors, Relator Leggins, Barbara Chen, and Defendant Henry about this fraud in an effort to stop the violations.

142.  OHA's violations and Relator Clerici's efforts to stop the violations include, but are not limited to, the examples outlined in this Count.

143.  Throughout his employment, Relator Clerici objected to OHA's fraud involving Finlay Development (throughout his employment), set forth in paragraphs 40 through 49, HDLI (September 2009), set forth in paragraphs 103 through 106, MD Strum (February and November 2010), set forth in paragraphs 81 through 83, and the Hampton Park entertainment system equipment (September 2010), set forth in paragraphs 79 and 80. Relator Clerici complained to Defendant Henry in an effort to stop these violations.

144.  Relator Clerici also made Relator Leggins aware of these violations. Relator Leggins brought Relator Clerici's concerns to Defendants Henry and Bryant

145.  From December 2010 through September 2011, Relator Clerici also objected to OHA's procurement fraud involving HD&W, as set forth in paragraphs 88 through 96. Defendant Henry again decided to cover up the procurement issues by paying the money OHA's attorney and then having the attorney pay HD&W. Relator Clerici further objected to this cover-up in an effort to stop the violation.

146.  Additionally, OHA improperly had only one employee in its warehouse, Stephen Fraser, to do all of the buying, receiving, and shipping of all inventoried items for OHA. Relator Clerici met with Ms. Chen and Defendant Henry on April 8, 2011, and informed them of this violation in an effort to stop the violation. During this meeting, Defendant Henry told Relator Clerici that if OHA got in trouble for any violations, Defendant Henry would make sure that Relator Clerici was blamed for such violations.

147.    Despite Defendant Henry's threats, when Relator Clerici learned of the procurement fraud associated with Stratigi, as set forth in paragraphs 50 through 64, he attempted to stop the violation.

148.    On June 22, 2011, when Sandra Stephens, an Accounts Payable Technician, asked Relator Clerici whether she should pay Stratigi because its contract was never procured, Relator Clerici followed up with Janet Bridges, OHA's Director of Human Resources, and Defendant Henry because they had been the ones to originally procure Stratigi. Relator Clerici then went to Ms. Bridges and Defendant Henry and complained of these violations in an effort to stop the violations.

149.    Rather than rectify the violations, however, Defendant Henry attempted to cover them up by requiring Relator Clerici to obtain after-the-fact quotes from Stratigi and two other vendors. When other vendors' quotes were lower than Stratigi, Defendant Henry instructed Stratigi to lower its bid, which it did on June 30, 2011.

150.    Relator Clerici complained to Defendant Henry about the cover-up in an effort to stop the violation.

151.    As a result of his lawful actions done in an effort to stop OHA's violations, Relator Clerici was harassed and retaliated against by OHA. Relator Clerici was forced to resign his position on December 11, 2011, as a fitting response to this retaliation, including threats that the OHA would blame Relator Clerici for the violations of law committed by OHA.

152.    As a direct and proximate result of this unlawful and discriminatory harassment and termination, Relator Clerici has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with his efforts to obtain alternative employment in an amount to be proven at trial.

## DEMAND FOR RELIEF

WHEREFORE, Relator Clerici demands judgment against Defendants for:

(a)     Two times his back pay;

(b)     Compensatory damages;

(c)     Pre- and Post-judgment interest;

(d)     Reinstatement in his previous position at OHA;

(e)     Attorneys' fees and costs of this action; and

(f)     Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relators hereby respectfully demand trial by jury on all issues and counts triable of right before a jury.


Dated: February 25, 2014

                                        Respectfully submitted,


                                        _Jill O Schwartz_
                                        Jill S. Schwartz, Attorney at Law
                                        Florida Bar No. 523021
                                        Teresa A. Herrmann, Attorney at Law
                                        Florida Bar No. 0882046
                                        Mollie Smith, Esquire
                                        Florida Bar No. 0085419
                                        655 W. Morse Boulevard, Suite 212
                                        Winter Park, Florida 32789-3745
                                        Telephone: (407) 647-8911
                                        Facsimile: (407) 628-4994
                                        jschwartz@schwartzlawfirm.net
                                        therrmann@schwartzlawfirm.net
                                        msmith@schwartzlawfirm.net

                                        Mike Bothwell, Esquire
                                        Georgia Bar No. 069920
                                        Julie Bracker, Attorney at Law

Georgia Bar No. 073803
Jason Marcus, Esquire
Georgia Bar No. 949698
Bothwell Bracker, P.C.
304 Macy Drive
Roswell, Georgia 30076
Telephone: (770) 643-1606
Facsimile: (770) 643-1442
Mike@whistleblowerlaw.com
Julie@whistleblowerlaw.com
Jason@whistleblowerlaw.com